**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

RONALD G. NIERMAN, ET AL.                    CIVIL ACTION NO. 10-0319

VERSUS                                        JUDGE S. MAURICE HICKS, JR.

OHIO CASUALTY INSURANCE CO., ET AL.          MAGISTRATE JUDGE KIRK

**MEMORANDUM RULING**

Before the Court is a "Motion and Order to Limit and/or Strike Consent Order and to Declare Order of Coverages" (Record Document 24) filed by Defendant Encompass Indemnity Company ("Encompass").  The motion is opposed by Plaintiffs Ronald and Jacalyn Nierman ("Plaintiffs") and Defendant Ohio Casualty Insurance Company ("Ohio Casualty").  See Record Documents 40 and 41.  The Consent Order at issue ranked an Encompass policy ahead of an Ohio Casualty policy and also declared a gap in coverage. See Record Document 19.

Also before the Court are Cross Motions for Summary Judgment filed by Encompass (Record Document 53) and Plaintiffs (Record Document 54).  The cross motions relate not only to the ranking issue, but also to the amount of excess uninsured/underinsured coverage available under the Encompass excess liability policy. See id.

All issues presented in the aforementioned motions came on for oral argument on July 11, 2011.  See Record Document 64.  For the reasons which follow, the "Motion and Order to Limit and/or Strike Consent Order and to Declare Order of Coverages" (Record Document 24) is **GRANTED** as to Paragraph One of the Consent Order and **DENIED** as to Paragraph Two of the Consent Order; Plaintiffs' Motion for Summary Judgment (Record

Document 53) is **GRANTED**; and Encompass' Motion for Summary Judgment (Record Document 54) is **DENIED**.

## BACKGROUND

At the outset, the Court gives a brief recitation of facts.  For the most part, these facts are drawn from the stipulated facts set forth in the Proposed Pretrial Order (Record Document 38) submitted by the parties.  On December 4, 2008, Plaintiff Ronald Nierman was the driver of a 2003 Toyota Camry, which was owned by his employer, A.A. Gilbert Pipe & Supply, L.L.C. ("A.A. Gilbert Pipe & Supply").  On that same date, Mr. Nierman was stopped at a red light on Youree Drive in Shreveport, Louisiana.  While stopped, he was rear-ended by Mr. Eric White, who was driving a Ford F-150 pick-up truck.  The force of the rear-end collision propelled Mr. Nierman's vehicle into the car in front of him.  The parties agree that the accident of December 4, 2008 was brought about by the sole fault and neglect of Mr. White and there is no comparative fault on the part of Mr. Nierman.

Plaintiffs' personal insurance carrier was Encompass.  Encompass insured Mr. Nierman with a "package" primary automobile liability and uninsured/underinsured (sometimes referred to as "UM") coverage and with excess personal liability coverage.  The parties do not dispute that the primary coverage provides $250,000 in automobile liability coverage and that same amount in UM coverage.  However, the amount of UM coverage under the $1 million excess liability policy is disputed in this matter and is one of the issues addressed in the pending cross motions for summary judgment.  Encompass contends that Mr. Nierman rejected UM coverage under the excess liability policy; thus, there is no excess UM coverage.  See Record Document 53.  It maintains that the total amount of UM

coverage available under the Encompass policies is $250,000.  See id.  Conversely, Plaintiffs contend that Mr. Nierman was unable to make a "meaningful selection" since the excess liability policy excluded UM coverage and the total amount of UM coverage available under the Encompass policies is $1.25 million.  See Record Document 54.

Following the accident at issue in this case, Mr. Nierman filed a claim against Mr. White and his insurer, State Farm Mutual Automobile Insurance Company ("State Farm"). This policy provided coverage to Mr. White and it has been exhausted.  Mr. White did not have an excess or umbrella liability insurance policy, and was not in the course and scope of his employment at the time of the collision.  State Farm paid its $25,000 liability limit to Mr. Nierman to settle the claims against Mr. White and State Farm.  Mr. White and State Farm have been released.

A.A. Gilbert Pipe & Supply had a policy of insurance through the Travelers Indemnity Company ("Travelers").  This policy was the primary UM carrier for A.A. Gilbert Pipe & Supply.  The policy declarations contained in the Travelers policy set forth that it provides $1 million in liability insurance coverage to A.A. Gilbert Pipe & Supply and the vehicle being operated by Mr. Nierman at the time of this accident.  On January 20, 2010, Plaintiffs settled with Travelers for the payment of $250,000.  Ohio Casualty also issued a commercial umbrella policy to A.A. Gilbert Pipe & Supply that provided UM coverage.

On April 1, 2011, Ohio Casualty filed a Motion for Summary Judgment.  See Record Document 16.  Prior to the April 19, 2011 opposition deadline, Chambers was notified that the parties had reached a consent agreement on the issues presented in the Motion for Summary Judgment.   On May 3, 2011, the Court entered a Consent Order.  See Record Document 19.  The Consent Order decreed:

     (1)     Encompass Policy No. 240688814 ("the Encompass Policy") ranks ahead of Ohio Casualty Policy No. USO0953661817 ("the Ohio Casualty Policy") for purposes of uninsured/underinsured motorist coverage under Louisiana Revised Statute 22:1295, and the Encompass Policy must be exhausted before the Ohio Casualty Policy provides any coverage; and

     (2)     There is a gap in coverage caused by A.A. Gilbert's selection of lower UM limits on Travelers Policy No. BA62971151 [sic] in violation of the insuring agreement and the "Maintenance of Underlying Insurance" condition of the Ohio Casualty Policy. Accordingly, the coverage threshold of the Ohio Casualty Policy does not "drop down" and its coverage threshold is not lowered as a result of A A Gilbert's failure to maintain underlying UM policy limits of $1,000,000.

Id.

At the time the Consent Order was entered, attorney Billy J. Guin, Jr. represented Encompass.  See Record Document 20.  On May 25, 2011, Scott Jones and Larry Boasso were substituted as attorneys of record for Encompass.  See Record Documents 20 and 23.  On June 1, 2011, new counsel for Encompass filed the instant "Motion and Order to Limit and/or Strike Consent Order and to Declare Order of Coverages" (Record Document 24) on the grounds that the Consent Order is "void as a matter of [Louisiana] public policy" and "is vitiated for lack of informed consent upon the parties."  Id. at 1.

The Court held a status conference on June 16, 2011 to discuss the pending Motion to Limit and/or Strike.  See Record Document 51.  At that time, the Court upset the jury trial date and set the Motion to Limit and/or Strike for oral argument.  See id.  The Court also directed the parties to file cross motions for summary judgment on the amount of UM coverage available under the Encompass excess liability policy.  See id.  Such motions were filed on June 22, 2011 and were also set for oral argument.  See Record Document 53 and 54.  Oral argument was heard on July 11, 2011.  See Record Document 64.

**LAW AND ANALYSIS**

**I.      Rule 54(b) Standard.**

Encompass labeled the instant motion as a "Motion and Order to Limit and/or Strike Consent Order and to Declare Order of Coverages." <u>See</u> Record Document 24.  However, the Court has construed the motion as a Rule 54(b) Motion to Reconsider the Consent Order of May 3, 2011, which was an interlocutory order.  <u>See</u> Record Documents 48 and 51.

Rule 54(b) provides that an order that adjudicates fewer than all the claims among the parties "may be revised at any time" before the entry of a final judgment.  F.R.C.P. 54(b).  Thus, Rule 54(b) is the proper procedural vehicle to request that a district court reconsider an interlocutory order.  <u>See</u> <u>Brown v. Wichita County, Tex.</u>, No. 05-108, 2011 WL 1562567, *2 (N.D.Tex. April 26, 2011).  While the exact standard for deciding a Rule 54(b) motion to reconsider is unclear, "whether to grant such a motion rests within the discretion of the court."  <u>Id.</u>  Moreover, "the district court's discretion in this respect is broad."  <u>Id.</u>

A Rule 54(b) motion to reconsider "requires the court to determine whether reconsideration is necessary under the relevant circumstances."  <u>Id.</u>  While the legal standard for evaluating a motion to reconsider under Rule 54(b) appears to be less exacting than that imposed by Rules 59 and 60, "considerations similar to those under Rules 59 and 60 inform the Court's analysis."  <u>Id.</u>  Such considerations include whether the movant is attempting to rehash its previously made arguments or is attempting to raise an argument for the first time without justification.  <u>See</u> <u>Valles v. Frazier</u>, No. 08-501, 2009 WL

4639679, *2 (W.D.Tex. Nov. 30, 2009).  Yet, because the district court is faced on with an interlocutory order, it is free to reconsider its ruling "for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." Brown, 2011 WL 1562567, *2, citing Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 185 (5th Cir.1990), abrogated on other grounds, Little v. Liquid Air Corp., 37 F.3d 1069, 1075 n. 14 (5th Cir.1994) (en banc).

## II.  Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).  "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).  If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536,

---

[1]The Court notes that the newly amended Rule 56 requires that there be "no genuine *dispute* as to any material fact," but this change does not alter the Court's analysis.  F.R.C.P. 56(a) and advisory committee's note (emphasis added).

540 (5th Cir.2005).

**III.    Consent Order.**

    **A.    Concessions Made by Encompass.**

In motion practice leading up to oral argument and during oral argument on July 11, 2011, counsel for Encompass made certain concessions relating to Paragraph Two of the Consent Order.  Paragraph Two provides:

> (2)    There is a gap in coverage caused by A.A. Gilbert's selection of lower UM limits on Travelers Policy No. BA62971151 [sic] in violation of the insuring agreement and the "Maintenance of Underlying Insurance" condition of the Ohio Casualty Policy.  Accordingly, the coverage threshold of the Ohio Casualty Policy does not "drop down" and its coverage threshold is not lowered as a result of A A Gilbert's failure to maintain underlying UM policy limits of $1,000,000.

Record Document 19.

The first concession relates to Encompass' attempt to void the Consent Order based upon error/mistake.  Previously, Encompass had argued that the Consent Order was "based on error and mutual mistake of the parties . . . because the limit of the Travelers policy, which allegedly created the gap, was based on a selection form which applied to another policy and not the policy in effect at the time of this accident."  Record Document 24-2 at 5.  The Court acknowledges confusion relating to the existence of two different Travelers policy numbers, BA6297L151 and BA8291L455.  However, the Court finds that such confusion was easily resolved by the affidavit of Melanie Law, Claims Department Unit Manager for Travelers.  Ms. Law explained that the 455 policy was a substitute policy issued due to an error in the initial installment plan arrangements.  See Record Document 41-2 at ¶¶ 6-7.  The 455 policy continued the same coverage terms from

the previous policies, including uninsured motorist coverage in the amount of $250,000.

See id.  Based on this explanation, the Court was satisfied that the UM selection form of September 2007 was in effect at the time of the December 2008 accident.  The Court indicated its inclination to rule accordingly at the June 16, 2011 status conference.

The Court's realtime from oral argument reflects that counsel for Encompass indicated that he had no reason to disbelieve Ms. Law.  However, he explained that while he had subpoenaed a copy of the Travelers file, the file did not contain a copy of the 151 policy and that he would be subpoenaing a copy of the 151 policy to verify that it had exactly the same coverages as the substitute 455 policy.  To date, counsel for Encompass has not challenged Ms. Law's affidavit, thereby leaving the Court to assume that he did indeed verify that the 455 policy continued the same coverage terms from the previous policies, including uninsured motorist coverage in the amount of $250,000.

Additionally, the Court's realtime from oral argument indicates that Encompass abandoned the argument that the no drop down provision in the Ohio Casualty policy was legally invalid.[2]   This concession was also made in Encompass' opposition to Plaintiff's Motion for Summary Judgment:

> In sum, the plaintiffs argue, and the defendant, Encompass, has now conceded, that Travelers Indemnity Company provided coverage for uninsured motorist on the vehicle Mr. Nierman was operating in the amount

_____

[2]Ohio Casualty argues that a gap of $750,000 in insurance coverage was created by the selection of lower UM limits of $250,000 on the Travelers policy by A A Gilbert in violation of the maintenance of insurance clause of the Ohio Casualty policy.  See Record Document 40 at 13.  Paragraph 2 of the Consent Order mirrors this argument, finding that there is a gap in coverage created by the failure of A.A. Gilbert Pipe & Supply to maintain $1,000,000 in underlying UM coverage; and that, in accordance with the applicable policy provisions, the Ohio Casualty policy does not drop down to close the gap.  See id.  at 13-14.

of $250,000.  Further, it is not disputed that Ohio Casualty Insurance Company provides $1 million dollars of additional uninsured motorist coverage but that the Ohio Casualty policy doesn't begin coverage until Mr. Nierman's damages exceed $1 million dollars.

Record Document 57 at 4.  In its own Motion for Summary Judgment, Encompass stated:

In this regard, Encompass avers that, should this Court find that Travelers Indemnity Company provides only $250,000 in uninsured motorist coverage herein,[3] there is, then, a $750,000 gap in uninsured motorist coverage available to Mr. Nierman before he reaches the available $1 million dollars in uninsured motorist coverage offered by Ohio Casualty Company.  In this regard, Encompass conceded that Ohio Casualty Company does not "drop down" to provide coverage for the gap.

Record Document 53 at 3.

Thus, in light of the Court's finding that the 455 policy was simply a substitution policy that continued the same coverage terms from the previous policies and further considering Encompass' concessions, reconsideration of Paragraph Two of the Consent Order, which addresses the gap in coverage and the no drop down provision, is not necessary under the relevant circumstances of this case.  See Brown, 2011 WL 1562567, *2.  The Rule 54(b) Motion to Reconsider is, therefore, **DENIED** as to Paragraph Two of the Consent Order.

## B.    Ranking of Insurance Coverage.

The Court now moves to Encompass' argument that the ranking set forth in Paragraph One of the Consent Order, wherein the Encompass policy was ranked ahead of the Ohio Casualty policy, violates public policy.  The parties have extensively briefed and orally argued this issue.  All parties agree that the controlling statute is La. R.S.

---

[3]The Court has ruled, and Encompass has conceded, that the Travelers policy provides only $250,000 in UM coverage.

22:1295(1)(c), which provides:

> If the insured has any limits of uninsured motorist coverage in a policy of automobile liability insurance, . . . then such limits of liability shall not be increased because of multiple motor vehicles covered under such policy of insurance, and such limits of uninsured motorist coverage shall not be increased when the insured has insurance available to him under more than one uninsured motorist coverage provision or policy; however, **with respect to other insurance available**, the policy of insurance or endorsement shall provide the following with respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, resident spouse, or resident relative, and the following priorities of recovery under uninsured motorist coverage shall apply:
>
> (I)    The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary.
>
> (ii)   Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage **available** to him . . .

La. R.S. 22:1295(1)(c) (emphasis added).

Relying upon the plain language of Section 1295 and citing Hellmers v. Nicholas, 98-0652 (La.App. 4 Cir. 1/6/99), 737 So.2d 781, Encompass maintains that the policies issued by Travelers and Ohio Casualty were issued "on the vehicle in which the injured party was an occupant," and therefore, are both primary policies according to the uninsured motorist statute.  See Record Document 24-2 at 7-8.  The Encompass policies should, therefore, rank after both the Travelers policy and Ohio Casualty policy.

In early briefing, Plaintiffs and Ohio Casualty relied upon Lee v. USAA Casualty Ins. Co., 571 So.2d 127 (La. 1990), arguing that the Ohio Casualty policy is a true excess policy which should not be required to pay ahead of a primary insurer such as Encompass. See Record Document 40 at 14-20; Record Document 41 at 8-9.  In later briefs and during oral argument, Plaintiffs cited to Mohr v. State Farm Ins. Co., 528 So.2d 144 (La. 1988),

as the controlling case.   The Mohr court dealt with both a gap in coverage and the determination of what coverage was available.   See id. at 148-149.[4]

After an extensive review of both Section 1295(1)(c) and all of the aforementioned cases and with the benefit of oral argument, the Court finds that reconsideration, or what may be more accurately referred to as clarification, of Paragraph One of the Consent Order is appropriate in this matter.   As set forth below, neither Lee nor Hellmers are directly applicable to the facts of this case, namely because of the gap in coverage.   Instead, as stated by counsel for Ohio Casualty during oral argument, the ranking issue in this case turns on the meaning of "available" under Section 1295.   Therefore, the Court believes Mohr to be controlling in this matter and hereby **GRANTS** Plaintiffs' Motion for Summary Judgment, as such motion is grounded in Mohr.

Lee arose from an automobile accident between Jeanne Lee and Eric Schroeder. See Lee, 571 So.2d at 127.   Mr. Schroeder was covered by a liability policy issued by USAA.   See id.   Dr. Lee, the owner of vehicle which Jeanne Elise was driving at the time of the accident, had two insurance policies which provided uninsured motorist ("UM")

---

[4]During oral argument, the Court and counsel for Ohio Casualty discussed harmonizing the Lee and Mohr cases.   The Court's realtime reflects that a key distinction acknowledged was that Lee did not address a gap in coverage while Mohr did.

Counsel for Ohio Casualty also indicated that she was arguing in the alternative. First, she argued that Lee was applicable because the Ohio Casualty policy is a true excess policy; thus, Encompass ranks before Ohio Casualty. Alternatively, she argued that even if the Court ranks Ohio Casualty before Encompass, there is a gap in coverage and Ohio Casualty would not pay until damages exceed $1 million. The Court's realtime further indicates that Plaintiffs' counsel made a similar argument in that he believed the end result would be the same for Plaintiffs under Lee or Mohr, i.e., that Encompass would rank before Ohio Casualty (Lee) or that Ohio Casualty would rank first, there is a $750,000 gap in coverage, and Encompass would then become the next "available" coverage and fill the gap between $250,000 and $1,000,000 (Mohr).

coverage.  See id.  The first policy, issued by Safeco, provided $250,000 UM insurance with a per occurrence limit of $500,000.  See id.  The second policy was a personal umbrella excess policy issued by Continental Casualty Company ("CNA") providing $1,000,000 UM insurance, with a per accident limit of $1,000,000.  See id.  The Louisiana Supreme Court was tasked with ranking the two UM coverages and ultimately ranked Safeco ahead of CNA.  See id. at 128, 130.  The Lee court focused on the "true excess" nature of the CNA policy, reasoning:

> Clearly, honoring the contractual primary/excess relationship between Safeco and CNA harmonizes with the intent of the statute. The occupant insured is given full protection. Safeco as the primary policy is not required to pay any more than it contracted to pay under its policy, and CNA's obligation to pay "over and above" what is covered by the primary policy is respected.

Id. at 128-129, 130.

At first glance, the Court agrees that Plaintiffs' and Ohio Casualty's reliance on Lee to support their argument that the Encompass policy ranks ahead of the Ohio Casualty policy appears sound.  However, both of the UM policies ranked in Lee were "uninsured motorist coverage *on the vehicle* in which the injured party was an occupant," as contemplated by Section 1295(1)(c).  Moreover, the UM coverages at issue in Lee were both policies of insurance issued to Dr. Lee.  In our case, the policies of insurance issued by Travelers and Ohio Casualty were issued to A.A. Gilbert Pipe & Supply, while the policy issued by Encompass was issued to Mr. Nierman individually.  Finally, in Lee, there was a contractual primary/excess relationship between Safeco and CNA, as Dr. Lee was the insured on both policies.  In this matter, there is no such contractual primary/excess

relationship between Ohio Casualty and Encompass.[5]   Moreover, as previously noted, there was no gap in coverage in the Lee case.

The Court now moves to the Hellmers case, which arose out of an automobile accident that occurred in Orleans Parish.   See Hellmers, 737 So.2d at 781.   Plaintiff Niles Hellmers was a guest passenger in the host vehicle, which was owned and operated by Julian G. Baudier.   See id.   The second vehicle was owned and operated by the tortfeasor, Anatole Nicholas.   See id.   At the time the accident occurred, there were several insurance policies in effect that provided coverage for the accident.   See id.

AllState, Ms. Nicholas' insurer, provided $10,000/$20,000 liability coverage.   See id.   Plaintiffs subsequently dismissed their claim against Ms. Nicholas and her insurer, AllState.   Prudential, Mr. Baudier's insurer, offered $100,000/$300,000 in UM coverage. See id.   Prudential tendered $100,000 under this policy.   See id. at 782.

Mr. Baudier also held an umbrella policy with Prudential insuring "Personal Catastrophic Liability."  Id. at 781-782.   The umbrella policy provided $1,000,000 in liability coverage once the underlying automobile policies issued by Prudential were exhausted. See id. at 782.   Plaintiffs' UM carrier also provided $100,000/$300,000 coverage for any injuries the Hellmers sustained while occupying a non-owned vehicle.   See id.   Faced with the issue of ranking of these two policies, the Hellmers court held:

> Prudential's argument that it's "true excess" policy is not primary until the plaintiffs' UM coverage is exhausted is without merit.   In light of La.R.S.

---

[5]A similar contractual primary/excess relationship seems to exist between Travelers and Ohio, as A.A. Gilbert Pipe & Supply is the insured on both of those policies.

22:[1295] and the holding in Capone, 467 So.2d 574,[6] we affirm the ruling of the trial court finding Prudential's umbrella policy which contained UM coverage for the vehicle in question to be primary to any other collectible insurance.

. . .

It is clear that the Hellmers' pursuit of coverage under the Prudential umbrella policy for their damages is statutorily permissible.

The anti-stacking law seems at first blush to limit UM recovery to one policy for a person injured in his own car, and, under a limited exception, to two policies for one injured in a car he does not own.  Yet the rule and the exception must be read *in pari materia* with the entire UM law. . . . The exception defines primary coverage as that coverage on the vehicle in which the person was injured.  If, however, that vehicle has more than one UM policy on it, then for purposes of the statute, all such policies are primary. . . . And, according to the statute "other uninsured motorist coverage available to [the insured]" is excess insurance.

Id. at 784, citations omitted.

Setting aside the $750,000 gap in coverage in our case, if Hellmers is read in

conjunction with Section 1295(1)(c), the Travelers policy, followed by the Ohio Casualty

policy, would be the primary uninsured motorist coverage because both of those are

"uninsured motorist coverage on the vehicle in which the injured party was an occupant."

---

[6]In Capone v. King, 467 So.2d 574 (La.App. 5 Cir. 1985), the plaintiff was riding as a passenger in a host vehicle and sustained injuries an uninsured motorist struck the host vehicle.  See id. at 577.  Because the tortfeasor was uninsured, the plaintiff filed suit against Allstate, the host driver's UM insurer, and Aetna, the host driver's employer's insurer because the host driver was en route to a work-related function.  See id.

Allstate had UM coverage in the amount of $100,000, whereas Aetna provided UM coverage for the host driver's vehicle in the amount of $500,000.  See id.  The host driver's employer also held $5 million dollars in UM coverage under an umbrella liability with Chicago Insurance Company.  See id.  Further, the plaintiff was also insured by a policy issued to her employer by Hartford.  See id.

The Louisiana appellate court held that the three policies containing UM coverage for the host vehicle were primary because they "all covered the car in which [the plaintiff] was a passenger."  Id. at 580.  The court further held that any attempt by these three insurers to seek contribution from Hartford would not be favored unless the plaintiff's damages exceeded the primary coverages on the vehicles involved in the subject accident.  See id.

See La. R.S. 22:1295(1)(c)(I).  The Encompass policy would appear to be "excess" under Section 1295(1)(c)(ii).  Yet, because of the $750,000 gap in coverage, the Ohio Casualty policy is not "other insurance available" to Mr. Nierman under Section 1295(1)(c), unless and until his damages exceed $1,000,000.  See Mohr, 528 So.2d at 148-149.  Hence, the Court moves on to Mohr, a case that analyzes what coverage is "available" when there is a gap in coverage.

In Mohr, the plaintiff was injured in an automobile collision caused by an uninsured motorist.  See Mohr v. State Farm, 515 So.2d 840, 841 (La.App. 4 Cir. 1987).  At the time of the accident, the plaintiff was occupying an automobile owned by her employer.  See id.  The employer's vehicle was covered by a primary liability policy with UM limits of $10,000, as well as an excess policy that required underlying limits of $500,000.  See id.  This created a $490,000 gap in coverage.  See id.  Due to the gap, there was only $10,000 in UM coverage available to the plaintiff.  See id. at 841.  Thus, the court had to determine whether the plaintiff could recover under her own personal UM policy.  See id. at 841-842.

The appellate court cited to La. R.S. 22:1406(D)(1)(c), the precursor to the current Section 1295(1)(c).  See id. at 841.  Like the current statute, Section 1406 provided that the injured occupant could recover as excess from other uninsured motorist coverage available to him once the primary coverage is exhausted.  See id.  The appellate court then held that the plaintiff could recover from her own personal UM policy because her employer's excess UM policy was "not available":

> The only primary insurance coverage afforded plaintiff was [the employer's primary UM policy].  Since its coverage was exhausted plaintiff may recover from other available coverage.  The [employer's excess UM] coverage is not available so that plaintiff is entitled to [her personal UM] policy limits of $50,000.

Page 15 of  22

Id. at 842.  The Louisiana Supreme Court affirmed the appellate court, stating:

> On the question of insurance coverage, the court of appeal was clearly correct.  Under LSA-R.S. 22:1406 D(1)(c), the uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary.  Both the [employer's primary policy] and [the employer's excess policy] provide primary coverage with a gap of $490,000.  Because [the employer's excess carrier] is only liable for the amount in excess of $500,000, there is no primary coverage available to the plaintiff between $10,000 and $500,000.  Since [the employer's primary carrier] and [the employer's excess carrier] essentially provide one coverage on the . . . automobile in differing amounts, [the plaintiff] was entitled to recover under her own uninsured motorist policy.

Mohr, 528 So.2d at 149 (internal citations omitted).

Based on the analysis set forth in Mohr, the Court must reconsider and clarify Paragraph One of the Consent Order, which decreed:

> (1)    Encompass Policy No. 240688814 ("the Encompass Policy") ranks ahead of Ohio Casualty Policy No. USO0953661817 ("the Ohio Casualty Policy") for purposes of uninsured/underinsured motorist coverage under Louisiana Revised Statute 22:1295, and the Encompass Policy must be exhausted before the Ohio Casualty Policy provides any coverage.

Record Document 19.  Contrary to the Consent Order, the Ohio Casualty policy is primary because it provides UM coverage on the vehicle and technically ranks ahead of the Encompass policy.  However, under Mohr, the $750,000 gap in coverage causes Encompass to become the next "available" insurance coverage to Mr. Nierman.[7]  Simply put, the Ohio Casualty policy is not "available" to Mr. Nierman due to the gap in coverage,

---

[7]Encompass also argued at oral argument that Mohr does not apply in this case because the Encompass policy contains an "Other Insurance" clause.  The Court finds this argument unconvincing for the reasons offered by Plaintiffs in their brief and during oral argument.  See generally Record Document at 63 at 3-4, 6-8.  The Encompass policy language does not conflict with Section 1295(1)(c) or the Mohr decision.  In fact, the "Other Insurance" clause referenced by Encompass specifically limits its application to other "available" insurance, such that the policy language fits together nicely with the analysis set for the in Mohr.

unless and until his damages exceed $1 million.  The Court acknowledges that the end result under Mohr appears to be the same as what is set forth in Paragraph One of the Consent Order, that is, the Encompass policy may have to be exhausted before the Ohio Casualty policy kicks in to provide any coverage for damages over $1 million.   Yet, the Rule 54(b) Motion to Reconsider must be **GRANTED** as to Paragraph One of the Consent Order such that the ranking issue can be clarified and is in compliance with both Section 1295(1)(c) and Mohr.[8]

## IV.  Amount of UM Coverage Available Under the Encompass Policies.

There is no dispute that the primary Encompass policy provides $250,000 in UM coverage.   However, Encompass and Plaintiffs dispute the amount of UM coverage available under the Encompass $1 million excess liability policy.  Encompass argues that Mr. Nierman rejected UM coverage under the excess liability policy; thus, the total amount of UM coverage available under both of the Encompass policies is limited to $250,000. See Record Document 53.   Plaintiffs argue that Mr. Nierman was unable to make a "meaningful selection" regarding UM coverage under the excess liability policy because the

---

[8]Plaintiffs also acknowledged this point in their Motion for Summary Judgment:

The Louisiana Supreme Court's holding in Mohr leaves no doubt that, although the Ohio Casualty coverage on the vehicle is primary, Encompass will provide coverage to fill in the gap, because the Ohio Casualty excess policy on the vehicle does not provide coverage that is "available" to Mr. Nierman for purposes of the ranking statute.   Although this analysis technically reverses the ranking of the policies in the Consent Order, the end result is the same; the Encompass policy . . . now provides coverage. This comports with the strong Louisiana public policy of making UM coverage available to innocent automobile victims to promote full recovery.

Record Document 54-2 at 6.

policy excluded UM coverage;[9] that his rejection was invalid; and that the total amount of UM coverage available under both of the Encompass policies is $1.25 million.  See Record Document 54.

UM coverage in Louisiana is provided for by statute and also embodies a strong public policy "to promote recovery of damages for innocent automobile accident victims by making UM coverage available for their benefit as primary protection when the tortfeasor is without insurance, and as additional or excess coverage when he is inadequately insured."  Roger v. Estate of Moulton, 513 So.2d 1126, 1130 (La. 1987).  The UM statute is to be liberally construed.  See id.  "The requirement that there be UM coverage is an implied amendment of any automobile liability policy, even one which does not expressly address the subject matter, as UM coverage will be read into the policy unless validly rejected."  Id.  Due to the strict construction requirement, Louisiana courts "have held the insurer bears the burden of proving any insured named in the policy rejected in writing the coverage equal to bodily injury coverage or selected lower limits."  Id.

The starting point as to this issue is La. R.S. 22:1295(1)(a)(ii), which provides, in pertinent part:

> Such rejection, selection of lower limits, or selection of economic-only coverage shall be made only on a form prescribed by the commissioner of insurance.  The prescribed form shall be provided by the insurer and signed by the named insured or his legal representative.  The form signed by the

---

[9]The parties do not dispute that the Encompass excess liability policy excluded UM coverage.  The Court's realtime from oral argument reflects that the undersigned questioned counsel for Encompass regarding whether an excess carrier as to automobile coverage was virtually duty bound to offer UM coverage, such that an insured may then reject that coverage or select lower limits of coverage.  Counsel responded that such an insurer was duty bound to offer UM coverage.  He further stated that if such an insurer excludes UM coverage, then the exclusion is void as a matter of public policy.

named insured or his legal representative which initially rejects such coverage, selects lower limits, or selects economic-only coverage shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto. *A properly completed and signed form creates a rebuttable presumption that the insured knowingly rejected coverage, selected a lower limit, or selected economic-only coverage.*

La. R.S. 22:1295(1)(a)(ii) (emphasis added).   There has been no challenge to the uninsured motorist selection form itself, as it appears to be the uninsured motorist selection form prescribed under Louisiana law.   Thus, there is a rebuttable presumption that Mr. Nierman knowingly rejected UM coverage.   Plaintiffs have now come forward with evidence to attempt to rebut the presumption that Mr. Nierman knowingly rejected UM coverage.

First, Plaintiffs note that "the insurer must place the insured in a position to make an informed rejection of UM coverage."   Tugwell v. State Farm Ins. Co., 609 So.2d 195, 197 (La. 1992).   The insured must be given "the applicant the opportunity to make a 'meaningful selection' from his options provided by the statute:  (1) UM coverage equal to bodily injury limits in the policy, (2) UM coverage lower than bodily injury limits in the policy, or (3) no UM coverage."   Id.   In this matter, the Court's realtime from oral argument reflects that counsel for Encompass conceded that the exclusion of UM coverage in the Encompass excess liability policy is void under Louisiana law.   The Court is inclined to find that such an invalid exclusion, standing alone, necessarily prohibits an insured from making a meaningful selection regarding UM coverage.   Yet, the Court need not make this finding because Encompass' concession in addition to undisputed facts set forth in Mr. Nierman's affidavit and deposition convince the Court that Mr. Nierman was not provided with an opportunity to make a meaningful selection regarding UM coverage under the excess liability policy.   In his affidavit, Mr. Nierman explained:

1.

On October 11, 2002, I initialed and signed a form for my personal excess automobile insurance policy entitled "Uninsured/Underinsured Motorists Bodily Injury Coverage Form" that applied to Encompass Policy Number 240688814. . . .  I initialed and signed stating "I do not want UMBI coverage, because there was no Excess Uninsured Motorist Coverage available under   the Encompass Policy Number 240688814.

2.

If Excess Uninsured Motorist Coverage had been available under the Encompass Policy Number 240688814, I would have chosen the first option of selecting UMBI coverage for economic and non-economic losses with the same limits as my Bodily Injury Liability Coverage.

Record Document 41-5.  In his deposition, Mr. Nierman further explained that whenever he was required to take an action regarding his insurance coverage, his insurance agent always comes to his office and brings the pages that he needs to sign.  See Record Document 53-4 at 4, lines 14:3-8.  His agent would go over the policies with him and discuss what the forms were about.  See id. at 4, lines 15:10-11.  The agent would also have the pages marked where Mr. Nierman was required to sign and he would then sign as indicated.  See id. at 5, lines 17:8-12.  More specifically, he testified:

When she brings these forms to my office and we go over things, I trust her opinion in these matters.  I value it.  And when she comes to my office, she usually has places marked for me to sign and that's what I did.

Id.

Mr. Nierman's affidavit and his deposition testimony have gone undisputed by Encompass.  Thus, as the record stands, it is undisputed that Mr. Nierman rejected UM coverage only because there was no such coverage available under the excess policy.  Had the excess policy allowed UM coverage, Mr. Nierman would have selected UM coverage with the same limits as the excess bodily injury liability policy, i.e., $1,000,000.

These undisputed facts establish that it was the invalid exclusion in the excess policy that prevented Mr. Nierman from making an informed and meaningful rejection of UM coverage. See Tugwell, 609 So.2d at 197.  Moreover, these undisputed facts are ample evidence for Plaintiffs to have successfully rebutted the presumption that Mr. Nierman knowingly rejected coverage.

Plaintiffs' Motion for Summary Judgment relating to the amount of UM coverage available under the Encompass $1 million excess liability policy is, therefore, **GRANTED** and Encompass' Motion for Summary Judgment on this same issue is **DENIED**.  The Court further declares that Encompass provides $250,000 of underlying UM coverage and $1,000,000 of excess UM coverage.

## CONCLUSION

Based on the foregoing analysis, Paragraph Two of the Consent Order remains unchanged and the Court again declares:

> There is a gap in coverage caused by A.A. Gilbert's selection of lower UM limits on Travelers Policy No. BA62971151 [sic] in violation of the insuring agreement and the "Maintenance of Underlying Insurance" condition of the Ohio Casualty Policy.  Accordingly, the coverage threshold of the Ohio Casualty Policy does not "drop down" and its coverage threshold is not lowered as a result of A A Gilbert's failure to maintain underlying UM policy limits of $1,000,000.

Record Document 19 at ¶ 2.  The Court reconsiders and clarifies Paragraph One of the Consent Order to clarify that while the Ohio Casualty policy is primary and technically ranks ahead of Encompass, the Encompass policies become the next "available" insurance coverage due to the $750,000 gap in coverage.  Additionally, Mr. Nierman did not make an informed and meaningful rejection of UM coverage under the excess policy.  Thus,

Encompass provides not only $250,000 of underlying UM coverage, but also $1,000,000 of excess UM coverage.

Accordingly, the "Motion and Order to Limit and/or Strike Consent Order and to Declare Order of Coverages" (Record Document 24) is **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' Motion for Summary Judgment (Record Document 53) is **GRANTED**; and Encompass' Motion for Summary Judgment (Record Document 54) is **DENIED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 28th day of March, 2012.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE